Marshall, C. J.
This cause comes to this court on error from the court of appeals of Franklin county. It was originally begun in the court of common pleas, and the sole relief prayed for was that the secretary of state be enjoined from submitting to the electors of the state of Ohio, at the election to be held November 7, 1922, a proposed amendment to the constitution, which proposed amendment, among other provisions, relates to the classification of property for purposes of taxation.
Four principal grounds are set out in two separate causes of action:
First it is urged that the petitions which have been filed in the office of the secretary of state, while containing the requisite number of signatures, do not contain a sufficient number of signatures written in ink, as required by Section 1 g, Article II of the Ohio Constitution.
Second, that the petitions were not filed in the office of the secretary of state ninety days before the November election.
Third, that the matter contained in the synopsis of the proposed amendment furnished by the secretary of state and printed upon the ballot is misleading and constitutes a gross abuse of discretion upon the part of the secretary of state.
Fourth, that by virtue of the provisions of Section le, Article II of the Constitution, the initiative and referendum provisions cannot be employed for the purpose of proposing an amendment to the constitution authorizing classification of property for the purpose of levying different rates of taxation thereon.
*4 These questions will be briefly disposed of in the order above named.
. First. Is there a sufficient number of signatures written in ink? It is conceded that if signatures written by means of an indelible pencil are lawful, the number of signatures is sufficient, not only as to the total number required but also as to the necessary percentage of signatures from each of one-half the counties of the state. The constitutional provision requiring construction is found in Section 1 g, Article IT, as follows: ‘ ‘ The names of all signers to such petitions shall be written in ink, each signer for himself.” The petition alleges the insufficiency of the petitions on the ground that the greater number of signatures was written in indelible pencil. The question therefore is squarely presented whether the use of indelible pencil is a compliance with the above-quoted provision of the constitution. The demurrer to the petition admits the truth of this allegation of the petition, and this court in order to find the petitions sufficient must therefore not only determine that indelible pencil is ink but is also required to take judicial notice of that fact. It is a rule of law, which has been declared by the federal courts, in which rule we concur, that courts may take judicial notice of any scientific fact which may be ascertained by reference to a standard dictionary. By reference to dictionaries and other standard scientific treatises we are not able to find that ink must be manufactured from any particular ingredients, and in fact it is a matter of common knowledge that ink can be manufactured from a great variety of substances. By reference to Funk & Wag-nails ’ Standard Dictionary we find the only informa *5 tion which, seems to have any direct bearing upon this subject, where ink-pencil is defined as “a pencil in which a solid indelible pigment takes the place of the usual lead.” It is not denied that the pencil which was in fact used by the signers to these petitions is indelible and that it therefore contains the pigment which distinguishes an ink-pencil from the ordinary lead pencil. We cannot therefore say as a matter of: law that an indelible pencil is not ink. We are the more impelled to this conclusion because of the extreme difficulties which would be placed in the way of circulating such petitions if it were necessary to use pen and ink instead of an ink-pencil. Inasmuch as the constitutional-framers provided that laws may be passed to facilitate the operation of the constitutional provisions, it is the plain duty of the courts in construing the constitutional provisions to give them such construction as will facilitate rather than obstruct their operation.
This view is further strengthened by another proLvision found in Section 1 g, to the effect that no law or amendment to the constitution which shall have been submitted ito the electors shall be held unconstitutional or void on account of the insufficiency of the petition by which such submission was procured. While of course the laws above referred to refer to legislative acts, and not to judicial construction, and while it is clear that the insufficiencies of petitions were only intended to be cured by submission without previous objection, nevertheless the presence of those provisions in the constitution clearly points the way toward liberality as to those matters which do not go to substantial rights. The substantial thing is the expressed desire for a submission of the *6 proposal. The structure of the ballot and the instrumentalities whereby that desire is communicated to the secretary of state constitute the formalities. It is more consonant with modem judicial thought to pay Jess regard to those formalities and technicalities cf procedure and to have greater regard to the substance. In providing that ink should be employed, it was no doubt in the mind of the constitutional-framers ito safeguard petitions against fraudulent practices and to forbid the use of ordinary graphite, because of its want of permanency and because of J)eing more susceptible to forgery and other fraudulent practices.
Second. Were the petitions filed in time? Section la, Article II, contains the following pertinent provisions: “The secretary of state shall submit for the approval or rejection of the electors, the proposed amendment, in the manner hereinafter provided, at the next succeeding regular or general election in any year occurring subsequent to ninety days after the filing of such petition. ’ ’ The petition was filed on August 9, 1922, and the question arises whether November 7 occurs subsequent to ninety days after August 9. We think this question has been determined by this court in a case where the principles involved were sufficiently parallel, to-wit, State, ex rel. Jones, v. Board of Deputy State Supervisors, 93 Ohio St., 14. From that case, at page 19, we quote as follows: “Under a requirement that an act be done a fixed number of days after a specified day, the first is to be included and the last excluded, in making the computation.” If August 9 be included and November 7 be excluded the provision for the 90-da.y interim will be fully met.
*7 Third. A third ground of objection is stated in the second cause of action of the petition, as follows: “Plaintiffs say that said proposed ballot form does not give the style, title or text, or a true copy of said proposed amendment, but said proposed ballot and form of ballot so prepared by the defendant contains argumentative statements in favor of said proposed amendments, such statements are contrary to and do not disclose the purport, intent, object, purpose or spirit of said proposed amendment. Such statements on said proposed ballot are unfair, misleading, unnecessarily and unfairly abbreviated and will deceive and mislead the voters of the State when attempting to mark or cast said ballot.”
That provision in Section Iff of the Constitution, providing for the matter to be printed upon the ballot, is as follows: “Unless otherwise provided by law, the secretary of state shall cause to be placed upon the ballots, the title of any such law, or proposed law, or proposed amendment to the constitution, to be submitted.”
Section 5019, General Code, does make statutory provision, and we are of the opinion that this statutory provision must be held to be a complete substitute for the constitutional requirement and that the legislature was fully authorized to create such substitute. We must therefore look to the statute to determine what matter shall be printed upon the ballot. The code section provides that if several amendments are to be submitted at the same election they may all be printed upon one ballot. Such ballot must be separate from other matters to be voted upon at such election. At the top of such separate ballot there shall be printed the words “Proposed *8 Amendment to the Constitution.” It appears that this has been complied with. It is equally clear that if several amendments are submitted, those words need only be printed once, using the plural form of the word amendment. The code section then provides: “Each amendment shall be stated thereon in language sufficient to clearly designate it,” etc. The only question before this court upon this proposition is therefore the meaning of the word “designate” and whether or not the matter printed upon the ballot is a compliance with such definition.
By consulting ithe standard dictionaries we find that a great variety of meanings is given to the word “designate.” Having in mind the observations already made pertaining to the first legal proposition herein discussed, we would hesitate to put a strained construction upon that word, and we would certainly hesitate to require the secretary of state to carry out and fulfil all of the obligations which might be imposed upon him by giving effect to all of the varieties and shades of meaning which have been given to the word by lexicographers and which are used and applied generally by persons in the everyday affairs of life. It is sufficient to say that the word “designate” cannot fairly or reasonably require the secretary of state to do the things which are complained of in this petition, as set forth in the above quotation. We find nothing that requires the style, title, text, or true copy of the amendment to be thus printed; neither can it be said that the printed matter upon the ballot should “disclose the purport, intent, object, purpose or spirit of said proposed amendment.” The most common definition and the one in most frequent use and appli *9 cation is “to point out; to distinguish, by marks of description; to call by a distinctive title; to denominate. ’ ’ Surely it must be agreed that the ballot goes much farther than the strict fulfilment of these definitions. We are of the opinion that the printed matter upon the ballot was not designed to perform the function of informing the voters of the text and effect of the propositions, but that it was chiefly for purposes of identification.
It is claimed, however, that the statements upon this particular ballot are designed to be argumentative and favorable to the proposed amendments, that they are unfair and misleading, and that they will in fact deceive and mislead the voters. It must be admitted that the statement of the proposed amendment could.be much more direct in advising the people that the design and purpose of this proposal are to authorize legislation toward classification of property for purposes of taxation, and yet a careful analysis of the printed matter will lead to a correct conclusion.
However this may be, the time afforded for marking ballots after the voter enters the booth does not permit a study of the printed matter on the ballot, especially in view of the fact that there are to be submitted not only a long ballot to be marked for the election of officers but also several proposals for amendments to the constitution. All study of the subject must necessarily end before the voter enters the booth, and this leads us to a discussion of the arguments which are to be mailed by the secretary of state to the voters.
We must again look to the allegations of the petition to see what complaint is made on this score:
*10 “Plaintiffs further say that arguments and explanations for and against said proposed amendment had been prepared by proper persons and committees and submitted to said defendant with the request that they be printed along with the proposed amendment, and mailed or distributed to the electors of the State, but plaintiffs are informed and believe that said defendant will not print, mail or distribute said proposed amendments and the arguments and explanations for or against the same to the electors of the State.” It is clear therefore that the principal fear is that no arguments will be mailed to the voters. There are several answers to this proposition. In the first place it was admitted in argument that the mail matter would be sent out in due time. In the next place, if such mail matter were withheld the proposal would be absolutely void, even if it should prevail at the polls, and this objection could be made after the election as well as before. In the ■third place, we are of opinion that there is no valid legal objection to the matter which has been prepared for mailing. The constitutional provision upon this point is (Section 1 g, Article II): “The secretary of state shall cause to be printed the law, or proposed law, or proposed amendment to the constitution, together with the arguments and explanations, not exceeding a total of three hundred words for each, and also the arguments and explanations, not exceeding a total of three hundred words against each, and shall mail, or otherwise distribute, a copy of such law, or proposed law, or proposed amendment to the constitution, together with such arguments and explanations for and against the same to each of the electors of the state, as far as may be reasonably possible.”
*11 The mail matter does in fact contain a copy of the proposed amendment and schedule. It also contains the matter which has been printed upon the ballot. It contains the arguments both for and against, and it is therefore very clear that the law in that respect has been complied with. It is proper to observe at this point that the argument against the proposition affords opponents of the measure an opportunity to call attention to any alleged omissions or discrepancies in the statement of the amendment upon the ballot, and thereby overcome the alleged efforts at deception which, have been claimed as set forth in the petition.
Nothing contained in this opinion should be construed to lend encouragement to indirection or any effort to deceive or mislead the voters, and if 'this court should be convinced that the matter printed upon the ballot, or the arguments for and against distributed by the secretary of state, would in fact mislead, or deceive, or defraud the voters, we would not hesitate to enjoin the submission. On the other hand, believing that the matter contained upon the balloit is comparatively unimportant, and that it complies technically with the statutory requirements, and believing, further, that the matter which has been or will be mailed to the voters affords an opportunity to study the provisions of the proposed amendment and the opportunity for reflection thereon, we have reached the conclusion that the judgment of the court of appeals is sound. If it is desired that more definite information be printed upon the ballot the remedy is with the legislature, and until such time as the legislature has made more specific provision than to merely require that the amendment shall be clearly designated, we find nothing in *12 the manner of this present submission to justify the extraordinary writ of injunction.
Fourth. We are asked to construe the language of Section le, Article II, which reads: “The powers defined herein as the ‘initiative’ and ‘referendum’ shall not be used to pass a law authorizing any classification of property for the purpose of levying different rates of taxation thereon,” etc. It is urged that the word “law” refers to the constitution, and it is pointed out that if the word “law” is confined to legislative enactment, whether by the general assembly or by initiative petition, the above-quoted provision would be without meaning or effect, because the constitution theretofore forbade classification. There must be universal concurrence in this view. The mere fact that the people have written into the constitution a section which is without meaning or effect will not justify this court in giving that provision vitality by giving meaning to words which could not fairly have been in the minds of the constitutional-framers. To give this provision meaning and effect it is only necessary that the word “law” be given the meaning “constitution.” This court has held that the word “law” may comprehend the constitution. But in determining whether or not the constitutional-framers had in mind this broad and comprehensive meaning of the word, we should look to the other sections of the constitution in which the same constitutional-framers have employed the word. It will be found that throughout those sections pertaining to the initiative and referendum the word “law” has been used in distinction from the word “constitution.” And this occurs not once but many times. It would therefore seem more reason *13 able to hold that Section le was intended for purposes of emphasis, thus placing an additional injunction upon the people in that behalf, and not resting merely upon the provisions theretofore written into the constitution on the subject of classification.
In thus disposing of the four propositions which have been ably and strenuously argued, it must be stated that each and all of them present great difficulties, and we could wish that the constitutional-framers and the legislature had been more careful in the language employed, and more definite and specific in the provisions relating to constitutional amendments, but we nevertheless entertain the conviction that the principles herein declared are in harmony with the declared purposes of the constitutional-framers as expressed in the entire provisions relating to the initiative and referendum.
The judgment of the court of appeals will be affirmed.

Judgment affirmed.

Hough, Robinson, Jones, Matthias and Clark, JJ., concur.
Wanamaker, J., concurs in the judgment.